COMMONWEALTH *vs.* HARRY JOSEPH MUTINA.

Middlesex.    September 18, 1974. — February 11, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY, KAPLAN,
& WILKINS, JJ.

*Practice, Criminal,* Capital case, Charge to jury.  *Insanity.  Homicide.
Jury and Jurors.*

Where at a murder trial there was no affirmative evidence of the
    defendant's sanity, but there was extensive evidence of his lack of
    criminal responsibility, where an expert witness had testified that the
    prognosis was poor and that the defendant would continue to be
    dangerous, and where the judge refused to give instuctions requested
    by the defendant explaining his postverdict status if found not guilty
    by reason of insanity, this court, under G. L. c. 278, § 33E, set aside
    the guilty verdict as against the weight of the evidence.   [812-817]
In a criminal trial where the defense of insanity is fairly raised, an
    instruction regarding the consequences of a verdict of not guilty by
    reason of insanity must be given at the option of the defend-
    ant. [817-823] QUIRICO, J., concurring in part and dissenting in part,
    with whom REARDON and WILKINS, JJ., joined.

INDICTMENT found and returned in the Superior Court on
July 16, 1971.

The case was tried before *Moynihan,* J.

*William P. Homans, Jr.,* for the defendant.

*Terence M. Troyer,* Assistant District Attorney (*Bonnie H. MacLeod-Griffin,* Assistant District Attorney, with him) for the Commonwealth.

TAURO, C.J.    The defendant appeals pursuant to G. L. c. 278, §§ 33A-33G, from a conviction of murder in the first degree and from the denial of his motion for a new trial.

Briefly, the facts are these. Around midnight on March 16, 1971, the defendant approached Ruth Achorn on the front steps of her home as she returned from a date. He stared at Ruth and her companion for about a minute, then raised his hand and fired two shots. One shot hit Ruth and killed her. The defendant fled, disassembled the gun, and threw it in the woods. He was apprehended about an hour and forty minutes later at McLean Hospital, where he was found crouching in a corner. He was taken to the police station where he "just grunted" in response to Miranda warnings and made no response to questions asked of him.

At trial, the prosecution offered no evidence regarding the defendant's mental capacity, relying instead on the "presumption of sanity" and on the circumstances surrounding the crime. The defendant presented lay witnesses who testified as to their observations of the defendant from his childhood up to the date of the offense. In addition, he called two qualified psychiatrists and introduced medical records of his stay at McLean Hospital. Relevant portions of this testimony will be discussed where appropriate in the course of this opinion.

The defendant assigns as error the trial judge's refusal to give requested instruction no. 9, which would have explained to the jury the defendant's postverdict status if found not guilty by reason of insanity.[1] He further assigns

---

[1] The text of the requested instruction is as follows: "In the event that the defendant is found not guilty by reason of insanity, the district attorney or other appropriate authority may petition this Court under our statutes for his commitment to a facility for the care and treatment of mentally ill persons, or

as error the judge's denial of his motion for a new trial. We find no reversible error in either of these assignments. However, pursuant to G. L. c. 278, § 33E, the entire case is before us for consideration on the law and the facts, *Commonwealth* v. *Bearse,* 358 Mass. 481 (1970); *Commonwealth* v. *Ransom,* 358 Mass. 580 (1970), and we are required "to consider the whole case broadly to determine whether there was any miscarriage of justice." *Commonwealth* v. *Baker,* 346 Mass. 107, 109 (1963). *Commonwealth* v. *Ransom, supra,* at 583. On thorough examination of the transcript and record and pursuant to our power under § 33E, we conclude that the verdict was against the weight of the evidence, and we reverse the conviction.

We recognize, of course, that the obligations imposed by § 33E require our most serious deliberation before we disturb the verdict of a jury who heard the evidence and saw the witnesses. "Regard for the public interest impels us to use with restraint our power under § 33E." *Commonwealth* v. *Williams,* 364 Mass. 145, 151 (1973). However, "[o]ur power to award a new trial without regard to technical rules of law should be exercised with primary focus on ultimate justice in the particular case. This means to us that we must concern ourselves primarily with the particular defendant and the particular facts." *Commonwealth* v. *Geraway,* 364 Mass. 168, 184 (1973). We turn to the particular facts which compel us to exercise this power in the instant case.

Although the fact is not mentioned in the briefs, there was testimony that the defendant is a young man with a history of mental illness on both sides of the family. He had been dating the deceased, Ruth Achorn, for a period from October, 1969, to July, 1970. At that time, the relationship began to deteriorate and Harry became very jealous and

commitment to Bridgewater State Hospital for care and treatment. If upon such petition the Court finds that the defendant is mentally ill at the present time, and that his discharge would create a likelihood of serious harm to himself or others, then the defendant would be committed to a facility, or to strict custody in Bridgewater State Hospital in appropriate cases. The order of commitment is thereafter periodically reviewed by the courts of the Commonwealth."

possessive. The testimony of Mrs. Mutina (Harry's mother) and Mrs. Achorn (Ruth's mother), both registered nurses, indicated that Harry's behavior changed markedly about this time. He began to complain about breathing difficulties and stomach pains. He appeared upset and withdrawn, ignored his work, and left the house in a shambles. He began to "shadow" Ruth, and on one occasion slapped her. In November, 1970, he hit Ruth, dislocating her jaw.

About this time he began making bizarre statements; his speech became thick and he was "very quiet, very withdrawn, listless, pallid." He became very secretive and quiet, while continuing to follow Ruth and to telephone her without speaking. Early in 1971 Harry was involved in a car accident near where Ruth lived, and two weeks later he was found in the Achorn house. When confronted, he told the Achorns he would never hurt "Ruthie," but was told he had already done so twice. Harry cried, and was advised to seek psychiatric help.

Shortly thereafter, Harry's parents arranged to have him taken to McLean Hospital where he was subsequently admitted. While at McLean, he refused visits from his parents and became very hostile. He was discharged from McLean against medical advice on March 3, 1971, and walked home through a snowstorm. After his return home, he screamed when spoken to, looked haggard and drawn, and continued to make bizarre statements.

Harry's father and a police lieutenant testified as to Harry's behavior after his arrest. He did not respond to questions and sat very rigid with his eyes closed tightly. He was asked what he had done with the gun, and after twenty minutes muttered "woods, woods." The remainder of the time he just sat with his head down, tense and stiff.

At the trial, the McLean Hospital records were admitted and they included a consultation note signed by Dr. Leff, a staff physician, giving a brief history of the defendant's life and family. The provisional diagnosis on admission was "schizophrenic process, acute paranoid type," with Dr. Leff's statement: "I feel that the danger of loss of control of

angry aggressive impulses is great and is recognized by the patient on some level." On discharge, the McLean records showed a diagnosis of "Passive-Dependent Personality with hysterical and paranoid features, unimproved." Records of the Bridgewater State Hospital, to which the defendant was admitted on March 23, 1971, were introduced and showed various diagnoses, all of which included some mention of possible schizophrenia.

Two qualified psychiatrists testified for the defendant. The first was Dr. Leonard R. Friedman, who saw him at the Billerica house of correction the day after the shooting. His ultimate diagnosis was "acute schizophrenic illness." He stated that the defendant lacked substantial capacity to conform his conduct to the requirements of law on March 16-17, 1971, and that he lacked substantial capacity to appreciate the wrongfulness of his conduct on those dates. The doctor felt more strongly about the former than the latter view.

Dr. Friedman described the defendant's mental illness and explained how the events beginning July, 1970, were symptomatic of his disorder. Additionally, he explained that the McLean diagnosis of personality disorder was not inconsistent with his diagnosis, since the defendant was not medicated while at McLean and did not talk freely with the doctors there. His testimony was consistent with the observations of the lay witnesses, and in fact supported them.

Dr. Samuel Epstein, who was appointed by the court on motion of the Commonwealth, testified that the defendant "is mentally ill with a schizophrenic disorder of insidious onset, [a]lthough the early manifestations were those of a passive-aggressive personality with paranoid trends." He further stated that the defendant was suffering from this illness at the time of the shooting, and "was not able to conform his conduct to that which he knew was wrongful [*sic*] by virtue of his mental disorder." Dr. Epstein explained the basis for his conclusions and attempted to harmonize the McLean diagnosis. In his opinion, that diagnosis reflected an earlier stage of the defendant's

illness, and was not inconsistent with his ultimate findings and conclusions.

In spite of a very detailed and skillful cross-examination, neither Dr. Friedman nor Dr. Epstein was shaken from his diagnosis as testified to in direct examination. Dr. Epstein did not retreat from his position, stating "to me, it is fairly classical that this is the way insidious, paranoid schizophrenics develop and behave." Dr. Friedman testified on cross-examination that, although the defendant had some capacity to appreciate criminality, it was "[v]ery little. That is, if a policeman was standing over his shoulder relating the law to him, it still wouldn't help." He denied this was a borderline case, and in answer to the last question on cross-examination, "Is it fair to say that you don't know how accurate your diagnosis is?" he answered, "I will disagree with you because I have a very good idea about the accuracy of my diagnosis."

The prosecution did not introduce any independent evidence bearing on the sole issue of criminal responsibility. It relied instead on the "presumption of sanity,"[2] on its cross-examination of the defendant's witnesses, and on the circumstances surrounding the shooting. *Commonwealth* v. *Ricard,* 355 Mass. 509, 514 (1969).

---

[2] We need not reëxamine the issue whether the presumption of sanity, or more accurately the probability that a particular defendant is sane because of the fact that most men are sane, *Commonwealth* v. *Clark,* 292 Mass. 409 (1935); *Commonwealth* v. *Cox,* 327 Mass. 609 (1951), can be sufficient in and of itself to carry the prosecution's burden of proving sanity beyond a reasonbale doubt where the defendant introduces overwhelming evidence of lack of criminal responsibility. Although there are decisions of this court which allow the "presumption" alone to carry the prosecution's burden, see, e.g., *Commonwealth* v. *Smith,* 357 Mass. 168 (1970), the continued vitality of this line of precedent may be questionable in light of the Supreme Court's decision in *In Re Winship,* 397 U. S. 358 (1970), which raises the reasonable doubt standard to constitutional stature. While these cases do recognize that the Commonwealth must prove sanity beyond a reasonable doubt, *Commonwealth* v. *Smith, supra,* there is no discussion as to what quantum of evidence is necessary to satisfy that burden. Considering the constitutional dimension added by the *Winship* case, and the recent tendency to scrutinize carefully presumptions in the criminal law because of the danger of shifting the burden to the defendant (see *Leary* v. *United States,* 395 U. S. 6 [1969]; *Turner* v. *United States,* 396 U. S. 398 [1970]; *Barnes* v. *United States,* 412 U. S. 837 [1973]; see also Holland and Chamberlin, Statutory Criminal Presumptions: Proof Beyond a Reasonable Doubt? 7 Valparaiso U. L. Rev. 147 [1973]), it may be questionable whether the "beyond a reasonable doubt" standard and the "presumption of sanity" can logically coexist in a case where there has been extensive evidence of insanity with no medical evidence to the contrary. However, we leave the resolution of this question to another day.

General Laws c. 278, § 33E, provides that, in capital cases, this court may order a new trial where it is "satisfied that the verdict was against the law or the weight of the evidence." We are to exercise this power where, in our judgment, the verdict ". . . is so greatly against the weight of the evidence as to induce in . . . [our] mind[s] the strong belief that it was not due to a careful consideration of the evidence, but that it was the product of bias, misapprehension or prejudice." *Commonwealth* v. *Gricus,* 317 Mass. 403, 406 (1944), quoting from *Scannell* v. *Boston Elev. Ry.* 208 Mass. 513, 514 (1911). In light of the absence of any affirmative evidence of the defendant's sanity and the very strong evidence of his lack of criminal responsibility, we are convinced that the verdict was against the weight of the evidence. *Commonwealth* v. *Cox, supra.* We are bolstered in our conclusion by two additional factors: the refusal of the judge to give the defendant's requested instruction no. 9, and the testimony of Dr. Epstein regarding the defendant's prognosis.

As previously noted, the defendant requested an instruction explaining what would happen if the jury found him not guilty by reason of insanity. This request was denied. The jury may well have misunderstood the consequences of such a verdict and may have based their verdict of guilty on fears that the defendant would go free if they acquitted him on the ground of insanity. This situation was aggravated by the testimony of Dr. Epstein, over the defendant's objection, that the prognosis was poor, that the defendant would continue to be dangerous and a menace, and that there was a likelihood of further trouble with the defendant unless he were treated in a maximum security hospital.[3] Had the jury

---

[3] The testimony of Dr. Epstein, over the defendant's objection, was as follows: "The prognosis, as I have stated in writing, is extremely poor, and the likelihood of further trouble, not only within himself but with society is extremely great. And, moreover, unless he is treated in a maximum security hospital he would continue to be a menace, as he has been in the past. In other words, this is prognostically not only a severe mental disorder but dangerous mental disorder. And, therefore, I predict that this [man] will not get well so readily as many of our other patients do, because of the nature of this diagnosis which began insidiously in our passive-aggressive personality fashion, which is only the beginning of paranoid schizophrenia, and one never really knows where one ends and the other begins, because it is really all one process."

been aware of the true disposition after a verdict of not guilty by reason of insanity, they might have been more disposed to render a verdict based on the evidence, free from their understandable fears for the safety and security of the public.

In light of what we have said, this case will be remanded to the Superior Court for a new trial. Although our action pursuant to § 33E is dispositive, we would be remiss if we did not consider the defendant's request for an instruction regarding the postconviction status of one found not guilty by reason of insanity which, in all probability, will be raised if the defendant is retried.

The principal argument for rejecting the practice of instructing juries as to the legal consequences of their verdicts in criminal cases seems to lie in the conviction that, in reaching their verdicts, jurors should be shielded from extraneous influences and should arrive at their verdicts only on a dispassionate consideration of the relevant and credible evidence presented to them in the adversary process. See, e.g., *State* v. *Park,* 159 Maine 328 (1963); *People* v. *Adams,* 26 N. Y. 2d 129 (1970), cert. den. 399 U. S. 931 (1970); *Lonquest* v. *State,* 495 P. 2d 575 (Wyo. 1972), cert. den. 409 U. S. 1006 (1972).[4] To inform jurors of the consequences of their verdicts is apparently seen, and in most cases with good cause, as inviting result-oriented verdicts and possible deviation from the basic issues of a defendant's guilt or innocence. This process, if allowed without restriction, could lead to the jury's usurpation of the judge's sentencing prerogatives and duties and the Legislature's policy determining functions.

Nevertheless, it is unrealistic to deny what trial judges and lawyers have long recognized. Jurors do not come to their temporary judicial service as sterile intellectual mechanisms purged of all those subconscious factors which have formed their characters and temperaments such as racial or ethnic background, sex, economic status, in-

---

[4] For a complete listing of those jurisdictions supporting this view, and those who reject it, see 11 A. L. R. 3d 737 (1967).

tellectual capacity, family status, religious persuasion, political leanings, educational attainment, moral convictions, employment experience, military service or their individual appreciations of the social problems of the moment.

Indeed, this court has recognized that such factors can affect the intellectual judgments of a juror without any consciousness of bias or prejudice and, for this very reason, has supported the jury system — which provides a fair cross section of the community — as the best protection against possible abuse or failure of judgment by even best intentioned individuals. *Commonwealth* v. *Bellino,* 320 Mass. 635 (1947), cert. den. 330 U. S. 832 (1947). *Commonwealth* v. *Ricard,* 355 Mass. 509, 512 (1969). *Opinion of the Justices,* 360 Mass. 877 (1971). See *Williams* v. *Florida,* 399 U. S. 78 (1970).

In recognizing the operative effect of such factors on jurors' deliberations and to counter balance them in so far as practically attainable, the courts have insisted on the establishment and maintenance of procedures to insure that juries are fairly drawn. By various procedural and evidentiary rules, the courts have established devices to withhold from jurors facts which might cause the subversion of their intellectual processes and, instead, elicit a verdict predicated on an emotional reaction.

For example, a trial judge acting in the exercise of his sound discretion may refuse to allow gruesome, color photographs of a murder victim to be entered in evidence even though, in the abstract, those photographs may be relevant and credible evidence. Compare *Commonwealth* v. *Smith,* 350 Mass. 600 (1966).

Again, the *Bruton*[5] rule prohibiting the introduction in evidence of one defendant's statement incriminating a codefendant recognizes that, despite the intellectual accuracy of curative instructions and the good faith efforts of jurors to comply with them, it is unrealistic to expect that jurors can by some mental exercise blot from their minds

[5] *Bruton* v. *United States,* 391 U. S. 123 (1968).

the effects of having heard such statements. See *Commonwealth* v. *Sarro,* 356 Mass. 100 (1969).

Despite his good will, maturity, acumen and sense of civic responsibility and despite his willingness to accept and his efforts to apply judicial instructions, the juror comes to the court room complete with that knowledge and those experiences, expectations, fears and frustrations which have shaped his character and attitudes. Quite apart from questions of obvious bias or admitted prejudice, no juror enters into his temporary judicial service stripped of his background and emotions. To hold otherwise would be to defy human experience. Indeed, the recognition of this fact underlies our system of peremptory challenges and challenges for cause.

Several frequently recurring types of situations substantiate the existence of this fact. Prosecutors know well the difficulty of obtaining convictions in drunken driving cases where conviction automatically leads to a license suspension.[6] Quite often, the jurors' aversion to convicting in such cases has little to do with the sufficiency of the admissible and credible evidence presented to them at trial. Rather, it is sometimes based on their social views toward drinking and their common knowledge of the inconvenient effects of the loss of a driver's license for an extended period of time. Furthermore, where the evidence reveals that the defendant depends on driving for his livelihood, the chance of conviction is substantially reduced, as jurors may acquit in order to avoid what they might consider to be unduly harsh economic sanctions.[7]

---

[6] Note recent changes in the Massachusetts drunken driving statute, G. L. c. 90, § 24, as amended by St. 1974, c. 647, § 1, which added § 24D, giving the court discretion to order early reinstatement of a license where the defendant participates in an alcohol education and/or treatment program.

[7] Jury acquittals motivated by a desire to avoid capital punishment under mandatory sentencing schemes provided a major impetus for the replacement of those schemes with overtly discretionary ones during the late Nineteenth and early Twentieth Centuries, in England and in the United States. Kalven & Zeisel, The American Jury (1966). See Mackey, The Inutility of Mandatory Capital Punishment: An Historical Note, 54 B. U. L. Rev. 32 (1974).

In the United States we have seen that "[w]here unpopular laws, such as gambling, liquor, or game laws are enforced, jury acquittals in the face of

Similarly, convictions are difficult to obtain in rape cases where there has been no serious violence other than the sex act itself and where the victim is a knowledgeable adult whose indiscreet conduct has, in the jury's opinion, contributed to the situation culminating in her rape. The same is true in "statutory rape" cases where the defendant as well as the victim is young and where they have been involved in a close and continuing relationship over an extended period of time.[8]

On the civil side, the so called "deep pocket" rationale may lessen the chance of a favorable verdict for an impersonal corporation, particularly if there is an appealing plaintiff such as a seriously injured child. This is true despite the fact that the law and the facts may strongly indicate the lack of the corporate defendant's liability.

Juries are generally instructed by judges in their charges and urged by counsel in their argument that they must not leave their common sense outside the jury room. In rendering a verdict, the evidence and the judge's instructions are undoubtedly considered within the framework of that common sense which includes the jury's collective concept of justice derived in turn from an amalgam of the respective juror's lifetime of personal experience. It is for this reason that the jury system has been described from time to time as a necessary device in our jurisprudence to blunt the sometimes sharp cutting edge of the law.

This is not to say that a jury, in deciding questions of guilt or innocence, are entitled to disregard the law as given to them by the judge or, in effect, to become an ex post facto Legislature with respect to the case entrusted to them. Neither are they allowed to consider facts relating to the case but not presented to them at trial, such as an inadmissible confession previously reported by the news

---

convincing evidence for conviction demonstrate jury distaste for these laws and result in their uneven application. When this occurs, a jury sits not only as a trier of fact, but as a purveyor of community values." Comment, 54 B. U. L. Rev. 158, 175-176 (1974).

[8] See Kalven & Zeisel, op. cit., at 276-280.

media, nor to consider irrelevant facts relating to the defendant. We recognize, however, that jurors are not disembodied spirits arriving at intellectual judgments in a vacuum.

If one accepts the rationality of this premise, then it is most difficult to rationalize with any compelling degree of logic or common sense the severe strictures against informing a jury of the consequences of a verdict of not guilty by reason of insanity.

Ordinarily, a jury are confronted with only two alternatives — a verdict of not guilty or a verdict of guilty. Only in rare cases is there a third alternative — not guilty by reason of insanity. Ordinarily, the jury know that a verdict of guilty will lead to the imposition of an appropriate sanction including incarceration if necessary in the best interests of the defendant and of society. Conversely, the jury know that a verdict of not guilty will lead to the defendant's exoneration and physical freedom. Only where the insanity defense is raised are the jury given a third alternative whose legal consequences they may not know or fully understand. Not to inform the jury of these possible consequences, when so requested by counsel or by the jury themselves, invites unnecessary speculation into their deliberations. Assuredly, the jurors will discuss this phase of a case in which a plea of insanity has been entered, and such discussion without the benefit of correct instruction may very well cause them to proceed on an erroneous basis.

On balance then, we believe it is best to entrust jurors with a knowledge of the consequences of a verdict of not guilty by reason of insanity.[9] If jurors can be entrusted with

---

[9] This result is in accord with that reached by the District of Columbia court in *Lyles* v. *United States*, 254 F. 2d 725 (D. C. Cir. 1957), cert. den. 356 U. S. 961 (1958), cert. den. 362 U. S. 943 (1960), cert. den. 368 U. S. 992 (1962), which required that such an instruction be given unless objected to by the defendant. Similarly, although in the minority, Michigan (*People* v. *Cole*, 382 Mich. 695 [1969]), Alaska (*Schade* v. *State*, 512 P. 2d 907 [1973]), and Nevada (*Kuk* v. *State*, 80 Nev. 291 [1964]) all either allow or require such instruction, and Indiana (*Dipert* v. *State*, 259 Ind. 260 [1972]) and Wisconsin (*State* v. *Shoffner*, 31 Wis. 2d 412 [1966]) allow it in certain circumstances. Although a majority of the States which have dealt with this issue have refused to allow such an instruction, we find the logic and reasoning of the *Lyles* case and its progeny more persuasive, especially as applied to the circumstances of the instant case.

responsibility for a defendant's life and liberty in such cases as this, they are entitled to know what protection they and their fellow citizens will have if they conscientiously apply the law to the evidence and arrive at a verdict of not guilty by reason of insanity — a verdict which necessarily requires the chilling determination that the defendant is an insane killer not legally responsible for his acts.

The instant case represents a classic example of the injustice which may occur when such information is withheld from the jury. The jury could have had no doubt that the defendant killed Miss Achorn. The jury also heard overwhelmingly persuasive evidence that the defendant was insane at the time of the killing and that, for a long time into the future, he will remain a menace to himself and to society. Foremost in their minds must have been a concern for the safety of the community.

In the absence of an instruction from the trial judge as to the effect of a verdict of not guilty by reason of insanity, the jurors sought to render justice both to the defendant and to society, but theirs was not a true verdict. It is no answer that the defendant's counsel, with the judge's permission, briefly alluded to the existence of our commitment laws by saying that such a verdict "doesn't mean that Harry walks out of this courtroom a free man." Juries are repeatedly told both by trial judges and counsel that they are to take the law from the judge's charge and not from counsel's arguments.[10]

Implicit in the jury's guilty verdict was a determination that the Commonwealth had proved the defendant's sanity beyond a reasonable doubt. On the record before us, we have found no rational justification or basis for such a finding, except the jury's understandable concern for the need to confine an insane and still dangerous killer for the protection of society. The jury, lacking knowledge of the

---

[10] This very issue was considered by the District of Columbia court in *Catlin* v. *United States*, 251 F. 2d 368 (D. C. Cir. 1957), where it stated, "[T]he better practice is for the trial judge, rather than for counsel, to give the explanation to the jury." *Id.* at 369. See also *Taylor* v. *United States*, 222 F. 2d 398 (D. C. Cir. 1955). Cf. *Goldstein* v. *Gontarz*, 364 Mass. 800, 810-811 (1974).

commitment necessarily flowing from a verdict of not guilty by reason of insanity, applied their own standards of justice in arriving at a verdict designed to ensure the confinement of the defendant for his own safety and that of the community. The evidence heard by them and the law given to them clearly played little part in their final verdict despite the length of their deliberations and the judge's delivery of the *Tuey*[11] charge. We believe that, had the judge given the instruction requested, the jury might not have arrived at a guilty verdict. Accordingly, when the defendant is retried, should he request an instruction explaining the consequences of a verdict of not guilty by reason of insanity, we hold that such instruction may properly be given.[12]

*Judgment reversed.*
*Verdict set aside.*

QUIRICO, J. (with whom Reardon and Wilkins, JJ., join, concurring in part and dissenting in part). I concur with that part of the court's opinion which, exercising the power conferred by G. L. c. 278, § 33E, grants the defendant a new trial. However, I am unable to agree with that part of the opinion which holds that "when the defendant is retried, should he request an instruction explaining the consequences of a verdict of not guilty by reason of insanity, ... such instruction may properly be given." The remainder of this opinion is limited to this area of dissent.

---

[11] *Commonwealth* v. *Tuey*, 8 Cush 1 (1851). See *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 98-103 (1973).

[12] We hold that in all *trials and retrials after this date where the defense of* insanity is fairly raised, the defendant, on his timely request, is entitled to an instruction regarding the consequences of a verdict of not guilty by reason of insanity. Such an instruction shall also be given on the request of the jury, if the defendant does not object thereto. We emphasize that our holding is not to be extended beyond advising the jury of the consequences of that verdict. We do not depart from the long-standing general rule that neither sentencing nor parole may appropriately be considered by the jury in reaching their verdict. See *Commonwealth* v. *McNeil*, 328 Mass. 436 (1952); *Commonwealth* v. *Goodwin*, 356 Mass. 632 (1970).

The holding of the court from which I dissent "relates in large measure to the province of the court and the duty and function of a jury in a criminal case." *Pope* v. *United States,* 298 F. 2d 507, 508 (5th Cir. 1962), cert. den. 381 U. S. 941 (1965). This division of responsibility was well delineated in *Commonwealth* v. *Anthes,* 5 Gray 185 (1855), where Chief Justice Shaw said, at 193-194: "In my opinion, it is for the judges to adjudicate, . . . to adjudicate finally, upon the whole question of law, and for a jury to adjudicate upon the whole question of fact. It appears to me that this is the true theory and fundamental principle of the common law, both in its civil and criminal departments." In other words, the traditional function of the jury in the trial of a criminal case in this Commonwealth is to receive the evidence presented to them, hear arguments by or on behalf of the litigants, receive instructions from the trial judge on the applicable law, retire, deliberate, find the facts, apply to them the law as given by the judge, and return a verdict that the defendant is guilty or that he is not guilty. In some cases the verdict may be that the defendant is guilty of a lesser offense included in the offense actually charged, and in some cases the verdict may be that the defendant is not guilty by reason of insanity. However, unless otherwise provided by statute,[1] the jury in this Commonwealth have no responsibility for, or authority to recommend, attempt to influence, or otherwise participate in any way in, the sentencing of a defendant whom they have found guilty.

It necessarily follows that the jury have no right to determine the crime of which the defendant is guilty, or the

---

[1] We are not concerned in this case with that part of G. L. c. 265, § 2, as appearing in St. 1951, c. 203, which provides: "Whoever is guilty of murder in the first degree shall suffer the punishment of death, unless the jury shall by their verdict, and as a part thereof, upon and after consideration of all the evidence, recommend that the sentence of death be not imposed, in which case he shall be punished by imprisonment in the state prison for life. No such recommendation shall be made by a jury or recorded by the court if the murder was committed in connection with the commission of rape or an attempt to commit rape." For the constitutional questions resulting from the manner in which juries exercised their discretionary power to negative an otherwise mandatory death penalty, see *Furman* v. *Georgia,* 408 U. S. 238 (1972), *Stewart* v. *Massachusetts,* 408 U. S. 845 (1972), *Commonwealth* v. *LeBlanc,* 364 Mass. 1, 14-15 (1973), and *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 233-234 (1973).

degree thereof, on the basis of the penalty which they believe the defendant should or might receive. Under our statutes the judge alone is responsible for deciding what the penalty shall be, within the minimum and maximum permitted by statute for the offense involved, and subject to review and amendment in certain cases by the Appellate Division of the Superior Court under G. L. c. 278, §§ 28A-28C, as appearing in St. 1968, c. 666, §§ 1-3. In this respect the practice in this Commonwealth is in accord with A. B. A. Standards, Sentencing Alternatives and Procedures, § 1.1 (pp. 13, 43) (Approved Draft 1968), to the effect that: "Authority to determine the sentence should be vested in the trial judge and not in the jury."[2] It is also in accord with the Model Sentencing Act, art. III, § 12 (2d ed. 1972), which provides that "[a]ll sentences under this act [for felonies] shall be determined by the judge of the court" (18 Crime and Delinquency, 365 [1972]), and with the Am. Law Inst., Model Penal Code, arts. 6 and 7 (Proposed Official Draft, 1962), placing all responsibility for sentencing in "the Court," thereby excluding the jury from any participation therein.

The jury are as much excluded from the commitment of a defendant whom they have found not guilty by reason of insanity as they are from the sentencing of a defendant found guilty. General Laws c. 123, § 16, inserted by St. 1970, c. 888, § 4, and as amended by St. 1973, c. 569, §§ 10-12, provides in part: "(a) The court having jurisdiction over the criminal proceedings may order that a person who has been found ... not guilty by reason of mental illness or mental defect in such proceedings be hospitalized at a facility ... [for the care and treatment of mentally ill or mentally retarded persons] for observation and examination." The statute then prescribes subsequent procedural steps depending on the outcome of initial observation

---

[2] For statements supporting the standard and criticising jury participation in sentencing, see the commentary to § 1.1. For similar criticism and for discussion of sentencing by a "sentencing tribunal" other than the trial judge, see Powers, The Basic Structure of The Administration of Criminal Justice in Massachusetts, pp. 117-118 (6th ed. 1973).

and examination, and for periodic reëxamination and commitments by the court for additional periods.[3] The statute gives the jury no role in the initial or subsequent commitments to mental facilities of the defendant whom they have found not guilty by reason of insanity.

In those jurisdictions where the jury have no mandated or permitted responsibility or function in connection with the imposition of sentences in criminal cases, it is generally accepted that a party may not as of right require the judge to instruct the jury about the penalty which may or must be imposed in the event of a conviction. The principal reasons for this rule are that such an instruction does not assist the jury in determining the issue of guilt or innocence and that knowledge of the permitted or prescribed penalty may cause or influence the jury to return a verdict designed to result in a particular penalty rather than one based on the facts and the law of the case.[4]

For substantially the same reasons, it is generally held that a party to a criminal case may not as of right require the judge to instruct the jury about the possibility that the penalty imposed pursuant to a conviction may be suspended or cancelled or that the period of imprisonment may be reduced under laws relating to pardons or parole. In

---

[3] Before G. L. c. 123 was totally revised by St. 1970, c. 888, § 4, it included § 101, from which the new § 16 evolved in part. The former § 101 provided: "If a person indicted for murder or manslaughter is acquitted by the jury by reason of insanity, the court shall order him to be committed to a state hospital or to the Bridgewater state hospital during his natural life. The governor, with the advice and consent of the council, may discharge such a person therefrom when he is satisfied after an investigation by the department that such discharge will not cause danger to others."

It is appropriate to note at this point that the legal consequences of a verdict of not guilty by reason of insanity under the present statute, G. L. c. 123, § 16, are quite different from what they were under the previous statute, G. L. c. 123, § 101. Section 101 applied only to persons tried for murder or manslaughter, and the mandatory consequence of an acquittal by reason of insanity was that the defendant was "committed to a state hospital or to the Bridgewater state hospital during his natural life." Section 16 now applies to all crimes, and on acquittal by reason of insanity the commitment to a hospital is neither mandatory nor permanent, and there is no way of knowing how long the defendant will be held in custody if committed to a hospital.

[4] For further discussion of this rule and for cases relating thereto, see 75 Am. Jur. 2d, Trial, § 888 (1974), and annotations in 17 A. L. R. 1117, 1123 (1922), and 138 A. L. R. 1230, 1235 (1942).

*Commonwealth* v. *McNeil,* 328 Mass. 436 (1952), the defendant excepted to the judge's refusal to instruct the jury that if the defendant was found guilty of murder in the first degree with a recommendation that the death penalty be not imposed the defendant would not be eligible for parole from the resulting life sentence. G. L. c. 265, § 2. We overruled that exception with the following holding, at 442: "The defendant's contention is, in substance, that if the jury knew that the defendant could not be paroled they would be more likely to recommend a life sentence. Nothing in the statute suggests that parole is any concern of the jury. We think the judge was right." In the more recent case of *Commonwealth* v. *Goodwin,* 356 Mass. 632, 634 (1970), we held: "The judge properly and adequately stated the rule applicable to instructions on parole. In conformity with the *McNeil* case he clearly explained that parole was of no concern to the jury in reaching their verdict."[5]

In my opinion, the question whether a jury should be informed about the legal consequences of a verdict of not guilty by reason of insanity, in particular the consequence that the defendant in such a case, although acquitted, may be committed to a mental institution, is but a refinement of the general question whether the jury in a criminal trial should ever be informed of the legal consequences of their verdict. Admittedly, there are numerous judicial precedents which support a position on one or the other side of this question. The court in this case has elected to adopt the view which appears to have its genesis, at least as to Federal courts, in *Taylor* v. *United States,* 222 F. 2d 398, 404 (D. C. Cir. 1955), where the court said: "[W]e think that when an accused person has pleaded insanity, counsel may and the judge should inform the jury that if he is acquitted by reason of insanity he will be presumed to be insane and may be confined in a 'hospital for the insane' as long as 'the public safety and . . . [his] welfare' require."

---

[5] For further discussion of this rule and for cases relating thereto, see 75 Am. Jur. 2d, Trial, §§ 889-890 (1974), and annotations in 8 A. L. R. 2d 996 (1949) and 12 A. L. R. 3d 832 (1967).

This view was then followed, with an expanded discussion of reasons, by a divided court in *Lyles* v. *United States,* 254 F. 2d 725, 728-729 (D. C. Cir. 1957), cert. den. 356 U. S. 961 (1958), 362 U. S. 943 (1960), and 368 U. S. 992 (1962).[6]

Unlike the court in today's opinion, I find more persuasive the logic and reasoning of the three judges who dissented on this point in the *Lyles* decision,[7] and the similar or parallel logic and reasoning of the many decisions of other State courts which have reached a similar conclusion. I therefore respectfully dissent from that part of the court's opinion in this case.

A large majority of the jurisdictions which have faced this question have come to the same conclusion as the minority in the *Lyles* decision, some, for example *State* v. *Park,* 159 Maine 328 (1963), expressly rejecting the majority view in that case. In the *Park* decision (at 336), the court said that the jury were not concerned with "whatever may transpire after the verdict," and it refused to make an

---

[6] I believe that it should be noted at this point that neither the *Taylor* nor the *Lyles* decision was influenced by or premised on any constitutional considerations or requirements. They and later similar decisions resulted in part from the fact that the statutory law of the District of Columbia included a provision for the hospitalization of defendants acquitted by reason of insanity. Neither those two nor any other Federal court decisions represent or suggest any constitutional compulsion or obstacle affecting the freedom and ability of this court now to elect between the views of the majority and the minority in the *Lyles* case. See *United States* v. *McCracken,* 488 F. 2d 406, 416-422 (5th Cir. 1974).

[7] The judges who dissented in the *Lyles* case on this point said at 733 that since the only function of the jury "is to determine from the evidence the factual issue of guilt or innocence, . . . in reaching a verdict they should not be swayed by an extraevidentiary consideration such as whether they approve of the possibility of probation or of the penalty which may be imposed by the trial judge. The jury will probably know . . . that a verdict of guilty will result in the imposition of punishment unless probation is granted, but they will not know what the punishment may be and, therefore, will not be influenced to acquit if they consider the possible penalty too severe.

"The issue of insanity, fairly raised, does no more than present another factual question to the jury: whether the defendant was mentally responsible when the criminal act was done. That issue also should be determined on the basis of the evidence only and, in deciding it, the jury should not be influenced by a consideration of the result of an acquittal by reason of insanity; that is an extraneous consideration wholly unconnected with the evidence from which the jury must reach a determination of the factual issue raised concerning the defendant's mental condition.

"In short, the jury should be told nothing as to how the defendant will be dealt with in case of acquittal by reason of insanity."

exception for a case involving a verdict of not guilty by reason of insanity. In *Brown* v. *State,* 8 Md. App. 462, 466 (1970), a jury while deliberating sent the judge the following written question: "If Mr. Brown . . . is found insane by the jury, will he be allowed to go free or will he be put in a mental institution?" The judge answered only as follows: "If the defendant is found not guilty by reason of insanity, the disposition will be made by the Court in accordance with the law of Maryland." The Court of Special Appeals said, at 466-467: "The information requested was in nowise relevant or material to the jury's function of determining the sanity *vel non* of appellant. Such determination could only be properly made by them on the evidence pertinent thereto before them; the disposition to be made by the court in the event that the jury determined appellant was insane could play no part therein. . . . It would have been manifestly improper for the court to declare to the jury what it would do if the jury found appellant insane, just as it would be improper for a court to tell a jury what sentence it would impose if the jury returned a verdict of guilty of a substantive offense."

In *State* v. *Garrett,* 391 S. W. 2d 235, 242 (Mo. 1965), the court expressly refused to follow the *Lyles* case, referring to the division of the court on the present question. It categorized the legal consequence of an acquittal by reason of insanity as an "extraneous consideration" and said the requested instruction was "nothing less than an invitation for the jury to find the defendant mentally irresponsible *because* he would then be confined anyway."

In *State* v. *Conforti,* 53 N. J. 239 (1969), the Supreme Court of New Jersey quoted with approval, at 244-245, the following language from the decision of the Appellate Division in *State* v. *Bell,* 102 N. J. Super. 70, 75-76 (1968), cert. den. 52 N. J. 485 (1968): "[W]e decline to adopt the minority view, as exemplified by *Lyles* v. *United States* . . . that a jury must be informed of the consequences of a verdict of not guilty by reason of insanity unless the defendant specifically requests otherwise. . . . Generally speaking, the jury's duty, as distinguished from that of the

court, is to decide the issue of defendant's guilt or innocence. The defense of insanity does no more than present a question for the jury's consideration in determining that issue. . . . In making its determination, the jury should not be influenced by a consideration of what will be the result of its verdict, nor should its attention be distracted from its chief function."

In *People* v. *Adams,* 26 N.Y. 2d 129 (1970), the court said in declining to follow the *Lyles* rule, at 138-139: "There is conflict amongst the courts throughout the country on this issue. In a few jurisdictions it has been held that the instruction is proper and should be given. . . . However, in a majority of the jurisdictions, the courts have held that such an instruction should not be given. . . . It was, and is, our view that it would be improper for the court to give the instruction requested by the defendant. Consideration of punishment or disposition of the defendant is beyond the province of the jury. While it might be argued that the jury presently tends to consider possible punishment even though it is beyond their province, we conclude that to permit the instruction requested would only tend to exacerbate this problem. Such instruction might, as some of the majority jurisdictions have noted, prompt a jury to find insanity where the evidence might not otherwise have warranted such a finding."

In *State* v. *Hood,* 123 Vt. 273 (1963), the court quoted from both the *Taylor* and the *Lyles* cases. As to the statement in the *Lyles* case about the jury's not being well informed on the legal consequences of an acquittal by reason of insanity, Chief Justice Hulburd said at 276: "We break off the quotation in order to observe that we doubt that people in general are as ill-informed on the subject as the opinion assumes." He then quoted further from the *Lyles* opinion's holding that such an instruction shall be given unless it "appears affirmatively on the record" that the defendant does not want it given. To this Chief Justice Hulburd makes the pithy comment: "We think that the latter part of the opinion discloses the unacceptable nature of the reasoning upon which the holding rests. It is not one

which we would care to follow. At its best it tends to give justice, as applied to this situation, an a la carte quality in which the defendant may make as wily a choice as possible. If the rule were just, there would be no room for maneuvering of this sort. At its worst, the rule would seem to come close to inviting the jury to compromise, or at least to diverting their collective minds into areas which are not for their consideration. We like better the reasoning found in the dissent . . . [in the *Lyles* case, quoting part of the dissent]."[8]

The court's opinion in the present case concludes with a holding that the judge may properly instruct the jury on the legal consequences of an acquittal by reason of insanity only when the defendant requests such an intruction. The comparable language in the *Lyles* decision is (pp. 728-729): "Sometimes a defendant may not want such an instruction given. If that appears affirmatively on the record we would not regard failure to give it as grounds for reversal." This is the language which Chief Justice Hulburd said, in *State* v. *Hood*, 123 Vt. 273, 276 (1963), "tends to give justice, as applied to this situation, an a la carte quality in which the defendant may make as wily a choice as possible." I agree with that criticism. By giving all the options to the defendant supposedly to avoid the possibility that a jury will convict a defendant out of fear that to acquit him by reason

---

[8] The following are additional State cases which include holdings or statements supporting the view that a defendant may not, as matter of right, require the judge to instruct the jury on the consequences of an acquittal by reason of insanity. *Carr* v. *State,* 43 Ala. App. 642, 649 (1967), cert. den. 389 U. S. 877 (1967). *Campbell* v. *State,* 216 Ark. 878 (1950). *State* v. *Blake,* 209 Kans. 196, 205-208 (1972). *Smith* v. *State,* 220 So. 2d 313, 316 (Miss. 1969). *State* v. *Prevost,* 105 N. H. 90 (1963). *State* v. *Bracy,* 215 N. C. 248 (1939). *State* v. *Boham,* 29 Ohio App. 2d 142, 150-152 (1971). *State* v. *Daley,* 54 Ore. 514 (1909). *Commonwealth* v. *Gable,* 323 Pa. 449 (1936). *Rollins* v. *Commonwealth,* 207 Va. 575, 582-583 (1966). *State* v. *Barnes,* 54 Wash. 493, 495-496 (1909).

The parties have cited numerous Federal decisions, other than the *Taylor* and *Lyles* decisions, in support of their contentions. I have intentionally limited the use of such other Federal citations for the reason that the *Taylor* and *Lyles* decisions involve a statute peculiar to the District of Columbia for commitment of persons acquitted by reason of insanity, with no counterpart of that statute available to Federal courts outside of the District. That this difference makes many Federal decisions outside of the District of questionable precedential value on this issue is pointed out and explained in *United States* v. *McCracken,* 488 F. 2d 406, 416-422 (5th Cir. 1974).

of insanity will mean that he will be turned loose on society, the rule now adopted does not prevent, and perhaps invites, several equally likely and equally unacceptable possibilities.

One possibility is that the jury, knowing that acquittal by reason of insanity will result in the defendant's hospitalization rather than release, may return that verdict in a case where they would otherwise totally acquit him. We must remember that in the instant case the defendant's commission of the homicide was apparently not seriously controverted, and the defendant's sanity seemed to be the only seriously contested issue. Where the defendant's commission of the act in question *and* his criminal responsibility are *both* closely disputed matters, an instruction such as that permitted by the court today may well provide the jury with an irresistible temptation to compromise on a verdict of not guilty by reason of insanity. Another such possibility is that the jury, having the information the judge would provide, may find it much easier to acquit a defendant by reason of insanity than to convict him in a case where the evidence and the law require a conviction.

In our desire to afford the defendant a fair trial, we should not lose sight of the fact that the Commonwealth too has a right to a fair trial. *Commonwealth* v. *Roy,* 349 Mass. 224, 227 (1965). The defendant is entitled to a verdict by a jury who are not influenced by the legal consequences of that verdict. The Commonwealth is entitled to no less. I do not believe that the rule adopted in the court's opinion recognizes the Commonwealth's right, equal to that of the defendant, to a just verdict.

Both possibilities mentioned above point up the fundamental distinction between my view and that of the court on the issue before us. The court apparently believes that the jury cannot be restrained from considering matters not germane to their proper duties and that, accordingly, they should be permitted to consider at least one such nongermane matter in cases where that might be advantageous to the defendant. I believe, on the other hand, that while the jury undisputably have the *power* to make irreversible

errors (if only because of the constitutional provisions concerning double jeopardy), they have no *right* to make errors and ought not in any way be either encouraged to err or even told of their power to do so. See *United States* v. *Simpson,* 460 F. 2d 515, 518-520 (9th Cir. 1972), and cases there cited. Specifically informing the jury of matters beyond their proper scope of concern can only lead the jury to consider such matters and to bring in a verdict they deem necessary to obtain the disposition they think proper for the defendant after that verdict is returned.[9] Such is not, for good reason, the province of the jury.

Before departing from the long established salutary rule that a jury may not consider the legal consequences of their verdict, I would consider any other proper measure which might ensure the return of a verdict based on the evidence and the law applicable to the case. One such measure would be the giving of appropriate instructions to the jury on what they may and may not consider in reaching a verdict. It is not uncommon for a trial judge to instruct a jury in the trial of a claim for money damages, particularly in the trial of an action of tort for personal injuries, that they may not speculate on or consider such factors as the fee which the plaintiff's counsel may charge in event of recovery, the amount of insurance, if any, the defendant may have, or whether the amount recovered by the plaintiff will be subject to an income tax. I see no reason why a judge presiding over a criminal trial which involves a defense of insanity should not instruct the jury that they may not concern themselves with the legal consequences of an acquittal by reason of insanity.

That is exactly the approach which was upheld as long ago as 1909 in *State* v. *Barnes,* 54 Wash. 493, 494-496, 499-500. There the jury reported that they had agreed that the

---

[9] *Bruton* v. *United States,* 391 U. S. 123 (1968), cited today by the court for the proposition that juries will not always follow curative instructions as to how certain evidence can be applied, surely also supports the view that (1) informing the jury of the defendant's possible disposition after a particular verdict and then (2) telling them to disregard that information in reaching their verdict may not be entirely successful.

defendant had committed a homicide, but that they would be unable to agree on the defense of insanity unless they knew whether, in the event they found him insane, he would be incarcerated for life or whether he could be discharged at any time. The judge thereupon discharged the jury with the following statement at 495-496: "The fact that you are making your verdict in this case dependent upon the punishment, or what might be done with this defendant after this trial, satisfies me that you should not consider this case at all. It is not a matter for your consideration whether he would be discharged or not discharged. . . . [T]hat ought not to enter into your consideration at all. It has nothing to do with the question of whether he was sane or insane at the time he committed the act. It goes to his punishment; and, in other words, to be plain and curt with you, it is none of your business; it is the business of the law; and I, therefore, seeing that you cannot agree without taking that matter into consideration (which is entirely improper to take into consideration) feel that I would be doing the prisoner and the public both a great injustice to allow you to determine his guilt or innocence upon a question of that kind; and I therefore discharge you from further consideration of the case." The decision on appeal included the following statement (p. 500): "It certainly would have been improper for the trial court to have aided them [the jury] in reaching a verdict by any such method or to have instructed them as requested, with that object in view."