COMMONWEALTH *vs.* KEVIN E. LORING.

Plymouth.  September 16, 1982. — November 9, 1982.

Present: GREANEY, PERRETTA, & KASS, JJ.

*Insanity.  Practice, Criminal,* Instructions to jury.

At a murder trial at which the defendant had fairly raised the issue of his
    insanity and had requested an instruction regarding the consequences
    of a verdict of not guilty by reason of insanity in accordance with the
    decision in *Commonwealth* v. *Mutina,* 366 Mass. 810 (1975), the
    judge's failure to explain to the jury the extent of the court's participa-
    tion in and supervision over the commitment or release of the defend-
    ant, and his use of the word "competence" in relation to confinement
    procedures, created a risk of the jury's concluding that a dangerous
    defendant might be prematurely released, and was error requiring re-
    versal.  [657-661]

INDICTMENTS found and returned in the Superior Court
on January 25, 1978.

The cases were tried before *Irwin, J.*

*Daniel E. Callahan* for the defendant.

*John P. Corbett,* Assistant District Attorney, for the
Commonwealth.

KASS, J.  It is the general rule that the jury are not, in
arriving at their verdict, to consider either sentencing or
parole possibilities.  *Commonwealth* v. *McNeil,* 328 Mass.
436, 442 (1952).  *Commonwealth* v. *Goodwin,* 356 Mass.
632, 633-634 (1970).  *Commonwealth* v. *Mutina,* 366 Mass.
810, 817, 823, n.12 and the dissent of Quirico, J., at
825-832, in which the cases are reviewed (1975).  To that
general rule the *Mutina* decision carved out an exception:
upon the timely request of a defendant, the trial judge shall
instruct the jury regarding the consequences of a verdict of
not guilty by reason of insanity.  In his appeal the defendant
argues — in our judgment with merit — that he requested,

but did not receive, a proper Mutina charge, and, therefore, we reverse the judgments.

We begin our analysis by sketching the factual context. Kevin Loring, the defendant, was convicted of kidnapping, assault with intent to murder and assault and battery by means of a dangerous weapon. The victim was his mother. When arrested at his mother's house, shortly after 1:00 A.M., Loring was next to her on a couch, "almost on top of her," according to a police officer and had pushed the blade of a knife under his mother. The defendant's mother had red marks on both arms and around her neck, and a one-inch bald spot on the left side of her head. Police found a clutch of the victim's hair near the couch and another knife under an end table near that couch.

Violence in Mrs. Loring's home had begun some two hours earlier. The defendant had asked his mother to make some sandwiches for him and for a friend whom he had brought home. This she did but the same knife which cut the bread and buttered it became the object of the defendant's wrath. He raged at his mother, telling her never to pull a knife on him, grabbed the knife and stuck it in the wall. Thereafter the defendant drank wine and slept. A subsequent eruption began forty-five minutes to an hour later. Word got to the police around 1:00 A.M. They handled the situation with commendable caution, and kept the house under observation. Lights flickered on and off. During the flashes of illumination an officer was able to see the defendant jabbing his mother with a knife, notably in the area of her throat, and he heard the defendant shout, "I'm going to kill you." That was enough to induce the police to move into the house and arrest Loring. There was evidence that on the night the offense occurred the defendant was ranting and raving; that he accused his mother of having killed his father; that she was responsible for the death of her own sister; that he had explosives in a suitcase; and that he believed his mother was protected by the Portuguese Mafia; and that his brothers had conspired with his mother to kill his father.

That Loring was an angry man that night was not contested. Expert testimony from two psychiatrists, however, was in conflict as to whether the defendant was able to conform his conduct to law. A psychiatrist called by the defense diagnosed Loring as suffering from manic depressive illness of a circular type and as unable to control his actions when the assault occurred. A psychiatrist called by the Commonwealth thought Loring's problem was an immature personality aggravated by alcohol, but that his personality disorder did not impair his ability to conform to the requirements of the law.

Before the trial judge charged the jury, the defense requested an instruction nearly identical to that which was approved in *Commonwealth* v. *Mutina*, 366 Mass. at 811-812, n.1, viz.:

> "In the event that the defendant is found not guilty by reason of insanity (lack of criminal responsibility) the district attorney or other appropriate authority may petition this Court under our law for his commitment to a facility for the care and treatment of mentally ill persons, or commitment to Bridgewater State Hospital for care and treatment. If upon such petition the Court finds that the defendant is mentally ill at the present time, and that his discharge would create a likelihood of serious harm to himself or others, then the defendant would be committed to a facility, or to strict custody in Bridgewater State Hospital in appropriate cases. The order of commitment is thereafter periodically reviewed by the courts of the Commonwealth."

*Mutina* does not, of course, prescribe a particular litany which must be recited by the trial judge (*Commonwealth* v. *Callahan*, 380 Mass. 821 [1980]); it does require that the instruction inform the jury of the nature and extent of the confinement which flows from a verdict of not guilty by reason of insanity, i.e., that the defendant does not just walk out of the courtroom a free man, or out of a mental

health facility after a predetermined time. *Commonwealth v. Mutina, supra* at 822-823. This necessitates that the jury be told that a verdict of not guilty by reason of insanity: (1) permits an initial observation at a facility for the mentally ill for a period of forty days; (2) that during this period, upon petition of the district attorney or certain mental health personnel, the defendant could be committed to a mental health facility or to the Bridgewater State Hospital; (3) that in addition to the initial period of commitment of six months there will be additional periods of commitment if the defendant continues to suffer from mental illness or mental defect; (4) that the district attorney is informed of any hearing concerning whether the defendant may be released from confinement; and (5) that the question of retention in confinement or release is subject to judicial scrutiny. See G. L. c. 123, §§ 8 & 16; *Commonwealth v. Callahan*, 380 Mass. at 827-828.[1]

---

[1] The instruction found sufficient in *Callahan* appears in the record of that case as follows:

"Now, I might tell you what would happen to the defendant if you found him not guilty by reason of insanity. In this event, the Court may order the defendant to be hospitalized at a mental facility for a period of forty days for observation and examination. And that is in any facility, public or private, usually for the care of the mentally ill or retarded. If the Court is of the opinion that there is a matter of security, or for other reasons mentioned in law, the confinement may be in Bridgewater State Hospital. The court can order the commitment to the hospital for forty days. If the Court does not deem it necessary to commit him to a mental facility or to Bridgewater State Hospital, then the Court may discharge the defendant because the commitment is discretionary.

"If the defendant is committed and if you find him not guilty by reason of insanity, I would not discharge him until I at least had an examination. Within a period of sixty days after he is found not guilty by reason of insanity, and certainly within the forty days for which he is committed, then the District Attorney, the Department of Mental Health, may petition the Court for a commitment. He cannot be discharged in the meantime without notice to the Court and to the District Attorney.

"Now, if there is a petition for commitment, the Court has a hearing. If the Court then determines that he is mentally ill, he makes a commitment to a proper mental facility. If the Court finds that there is a likelihood of serious harm, or for other reasons stated in the statute it would be dangerous not to have him securely committed, the Court may order him committed to Bridgewater State Hospital after that hearing, at which he has

It is against these standards that we consider the Mutina instruction in the instant case. It read as follows:

> "Now, somebody may ask, what would happen to the defendant in the event that we found him not guilty by reason of insanity. In the event that the defendant was to be found not guilty by reason of insanity, under our law, he would be committed by order of the court for a period of 40 days to an appropriate institution. And during that period of 40 days, the district attorney or the superintendent could petition the court for his commitment for treatment, if, in fact he was found to be incompetent during that 40 day period. If at the end of that 40 day period he was found to be incompetent, he could be committed for a period of six months for treatment. If at the end of that period he was found to be competent, he would be released."

The principal shortcoming of the instruction, to which a timely and specific objection was made, is that it failed to explain to the jury the extent of the court's participation and supervision over the commitment or release of the defendant. It was open to the jury to speculate that the court had relinquished all control over the fate of the defendant and that the defendant was likely to be released at the conclusion of forty days and six months. As delivered, the instruction tended to thwart the purpose of a Mutina charge, which is to assure the jury that our law provides that restrictions placed on the liberty of a person found to be not guilty by reason of insanity may not be removed "unless a judge approves the removal, and, most significantly, the proper hospital official must notify the judge and the district attor-

---

an attorney. Thereafter, at least once a year upon petition, the Court periodically reviews the mental status of the defendant. If he is still mentally disturbed or insane, he is kept in the facility, and depending on his condition, the type of facility, is considered. If he is sane and can resume a normal life, he is later discharged. This is what happens when you find the defendant not guilty by reason of insanity."

ney who have or had jurisdiction of the criminal case if discharge of the individual from commitment is contemplated." *Commonwealth* v. *Killelea*, 370 Mass. 638, 647-648 (1976). As the court also noted in that case "[T]here is no automatic connection between acquittal by reason of insanity and a relinquishment of control over the person acquitted." *Ibid.* Compare *Commonwealth* v. *McColl*, 375 Mass. 316, 320 (1978), in which it was held that it was not error for the instructing judge to tell the jury that, if at the initial commitment hearing it was determined by the court that the defendant (in the *McColl* case) was no longer suffering from mental illness, "he'd go right out onto the street." That observation was made in the context of a charge which listed for the jury the full range of statutory procedure available upon a finding of not guilty by reason of insanity.

A lesser, but compounding, flaw in the instruction was the judge's introduction of the word "competence" into the charge, a matter as to which defense counsel made timely objection and request for correction. This is not the first time that the words "mental illness," "criminal responsibility," "legal insanity" and "competence" have been used as if they were synonymous. See, e.g., *Commonwealth* v. *Costa*, 360 Mass. 177, 186 (1971); *Commonwealth* v. *Sheehan*, 376 Mass. 765, 766 n.1 (1978); *United States* v. *Madrid*, 673 F.2d 1114, 1118 (10th Cir. 1982). In criminal cases the issue of competence arises in relation to the ability to stand trial. There the test for competence is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky* v. *United States*, 362 U.S. 402 (1960), quoted in *Commonwealth* v. *Hill*, 375 Mass. 50, 52 (1978).

A person may be competent to stand trial and yet be quite insane for purposes of determining criminal responsibility. Until the charge came to a description of what the confinement procedures would be in the event of a finding of insanity by the jury, the word "competence" had not appeared in

the instructions. Its injection into the charge at that point created the hazard that the jury might conclude that the standard of release from confinement in a mental institution is one which is less rigorous than a determination that the defendant is no longer mentally ill, or that, if still mentally ill, that the discharge would not create a likelihood of serious harm. G. L. c. 123, § 8(a). See *Commonwealth* v. *Nassar*, 380 Mass. 908, 915-918 (1980). We are of opinion that the charge, read in totality, ran the risk that the jury would apply its own motions of competence and would infer that a dangerous defendant could be prematurely released.

On the basis of the view we have taken of the appeal, it is not necessary to consider the other argument raised by the appellant, which concerned another aspect of the instructions. The judgments are reversed, the verdicts are set aside, and the case shall stand for a new trial.

*So ordered.*