COMMONWEALTH vs. JAMES P. RIVA, SECOND.

Plymouth. September 10, 1984. — October 31, 1984.

Present: GREANEY, C.J., CUTTER, & WARNER, JJ.

*Homicide. Insanity. Evidence,* Sanity, Admissions and confessions. *Practice, Criminal,* Instructions to jury.

At the trial of a defendant charged with the murder of his grandmother, evidence of the defendant's criminal responsibility, including testimony of a psychiatrist called as an expert witness by the Commonwealth, was sufficient to sustain the Commonwealth's burden of proving that the defendant was criminally responsible, although there was also evidence that the defendant had a substantial history of mental instability and confinements in mental institutions and hospitals. [716-719]

At the trial of a murder case, the judge's charge to the jury regarding the consequences of a verdict of not guilty by reason of insanity was adequate. [719-720]

At the trial of a murder case, the judge did not err in finding that the defendant's mother was not acting as an agent of the police when she made two visits to the defendant in a house of correction, and in denying the defendant's motion to suppress statements made by him to his mother during the visits. [721]

INDICTMENTS found and returned in the Superior Court Department on July 15, 1980.

The cases were tried before *Brady,* J., and a motion for a new trial was heard by him.

*Willie J. Davis* for the defendant.

*Robert S. Sinsheimer,* Assistant District Attorney, for the Commonwealth.

CUTTER, J. Riva was indicted for the murder on April 10, 1980, of his grandmother, Carmen Lopez, and for arson (on that date) of her house in Marshfield. After a trial (from October 21 to October 28, 1981) at which his contention was insanity, he was found guilty by a jury of second degree murder and

arson. He appeals from these convictions and from the denial of his motion for a new trial.

It is not now disputed that Riva killed his grandmother in circumstances later outlined.[1] He had lived with his grandmother for about nine months prior to April, 1980. Then he began living with a granduncle, Henry Lopez. On the evening of April 9, 1980, Riva told his granduncle that he was going to Plymouth the next day to see about a job. On the following morning, Henry Lopez drove Riva to Braintree, where Riva's father was working. There Riva borrowed his father's automobile and drove to Marshfield. About 1:45 P.M. Riva talked with a high school teacher at an auto supply store about fixing the brake lining of his motor vehicle. The teacher noted nothing unusual about Riva that afternoon. Riva then drove to a point around the corner from the house of his grandmother, with whom he had engaged in recent disagreements, in part about his long hair and lack of employment. He arrived at her house about 3:00 P.M. and found his grandmother alone lying on a couch. She asked him to do some washing for her. This he started to do. He then took upstairs some gold painted bullets and a gun, which he had previously hidden in the cellar. His grandmother saw the gun and threw a glass at him. He shot her at least twice and stabbed her, after which he carried her into her bedroom, poured dry gas over her, and set her on fire. He rolled her wheelchair into her bedroom.

Riva left the house, apparently without his departure being seen. About 3:00 P.M., a painter working nearby, who had seen Riva earlier as he was entering the house, was informed that smoke was coming from the house. He called the fire department and the fire was eventually extinguished.

Riva drove to Braintree to pick up his father, whom he took back to Marshfield. While there, in a conversation at the scene

---

[1] Riva, by his appellate counsel, does not press a contention, earlier made, that the trial judge erroneously failed to suppress a statement made by him on April 11, 1980, about 9:25 P.M. That statement was in fact suppressed. A statement made by Riva earlier that day was not suppressed and was heard by the jury from the tape on which it was recorded.

of the fire with neighbors and others, Riva admitted that he had been in the house earlier that day.[2]

Prior to trial Riva was held for a time at the Plymouth County House of Correction. There Mrs. Janet Jones, Riva's mother, visited him twice about June 10 to 12, 1980. Mrs. Jones "asked him how he was feeling, and he said his brain was on fire, that he was sick, his stomach hurt . . . that he had to talk to somebody, his lawyer told him not to talk with anyone, but he had to talk to someone, and that the voices were really bad in his head." Then ensued a macabre conversation[3] in which Riva described the events on the day he killed his grandmother.[4] The trial judge denied Riva's motion to suppress his statements to his mother. Riva's mother, on cross-examination by his

---

[2] On the afternoon of the fire Lieutenant McNamee had entered the house and had found a grey metal box. He passed this to the deputy fire chief who gave it to the Marshfield police. On the day following the fire, Riva made persistent efforts to recover from the police the box, which contained papers of his and some gold painted bullets. This action led to a confrontation with Lieutenant Lopes of the Marshfield police. Riva struck him and was arrested. A small silver jack-knife was found on Riva.

[3] As quoted by his mother, Riva said that he had "been a vampire for more than four years, that was when the voice came out of the sun in the marsh and told me I had to be a vampire, and I have had to drink blood for a long time. . . ." He claimed to have "been talking to the devil for a long time." His mother asked him, "[H]ow do you talk to the devil and do you actually hear the voices, do you talk out loud . . . . [Riva] said, no, it is just in my head, I ask questions, the voice answers me, and, you know, it is the devil that answers my questions." Riva went on to say that, on the morning of the fire, "the voice told him . . . that was the day he was going to die if he didn't kill his grandmother, and he said he fought with the voice all day, he didn't want to."

[4] Riva described to his mother shooting his grandmother and setting her on fire, in general as described in the text of this opinion. He told her also that he had meditated suicide but the voice dissuaded him. Riva explained that the bullets "had to be painted gold because, if they weren't gold, they wouldn't find their mark." He went on to say, "I didn't stab her and didn't hit her on the head like they said I did, but I then drank her blood because, you know, I have to because that's what vampires do," and then, after an interval, "I didn't want it to happen, and I kept telling the voice all day that I couldn't do it."

counsel, also testified to a long course of extraordinary and distressing behavior by Riva from a very early age.[5]

Riva's appellate counsel presses three contentions. Relevant evidence, if not already summarized, is outlined below with respect to each contention.

1. Riva's counsel first contends that the convictions were against the weight of the evidence and that a new trial should be granted in order to avoid a miscarriage of justice. There is no doubt that Riva had a substantial and well-documented history, prior to April 10, 1980 (see note 5, *supra*), of mental instability and confinements in mental institutions and hospitals.[6] Four psychiatrists of substantial experience, called as expert witnesses by Riva, testified that Riva suffered from serious mental illness. These psychiatrists (as well as some

---

[5] This testimony may be summarized as follows. At four, he had an altercation with his father and tried to call the police and, when that was prevented, attempted to injure his father. When hospitalized with pneumonia and later in kindergarten, he drew pictures of bleeding human anatomies and of people being shot. At thirteen he started drawing pictures of vampires and of women with puncture wounds dripping blood. He periodically began eating food with the appearance of blood (mixtures of oil, ketchup, parts of animals). He would go long periods without sleep and would run away. His school attendance suffered and he became involved with the police. In 1974 he was committed to McLean Hospital (a psychiatric hospital) for six months. After release, he continued out-patient treatment and also his earlier strange conduct. He was committed to a Westwood hospital because of threats to kill his father. He engaged in strange conversations with his mother and referred to "voices from outer space . . . [that] would be directing his body." He left an apartment to which he had moved, and disappeared for four months. He turned up in Florida. After his return, he killed a cat, cut off its head, and took out its brain, in an effort to learn how to "fix his own" brain. He told his mother that he had drunk the cat's blood. Other episodes led to his being treated at Boston University Hospital, Taunton State Hospital, and the Mayflower Clinic in Plymouth.

[6] Following the events of April 10, 1980, Riva was at the Massachusetts Correctional Institution, Bridgewater, for psychiatric observation until June 6, 1980. For a time (see notes 3-5, *supra*) he was at the Plymouth County House of Correction, but was readmitted for observation at Bridgewater on June 25, 1980. He remained there for a considerable period. A Superior Court judge (not the trial judge) found on March 19, 1981, that Riva was not then competent to stand trial. This conclusion was later altered. The Bridgewater and various other hospital records were admitted in evidence by agreement and parts of them were read to the jury.

staff psychiatrists who examined Riva at Bridgewater State Hospital and elsewhere, but who did not testify at trial) concluded (with some variations in their reasons) that Riva, on April 10, 1980, lacked criminal responsibility, essentially under the test discussed in *Commonwealth* v. *McHoul,* 352 Mass. 544, 546-547 (1967).[7] See *Commonwealth* v. *Kostka,* 370 Mass. 516, 532 n.15 (1976). Compare *Commonwealth* v. *Mattson,* 377 Mass. 638, 643-645 (1979).[8] No one of them was shaken in his conclusions by cross-examination.

Dr. Martin Kelly, a psychiatrist, was called as an expert witness by the Commonwealth. In September, 1980, and thereafter, he had been sent by the prosecutor materials[9] with respect

---

[7] The rule was stated in the *McHoul* case in the words of the American Law Institute's Model Penal Code, Proposed Official Draft (1962), "Section 4.01 Mental Disease or Defect Excluding Responsibility. (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law."

[8] One such expert witness thought Riva, on April 10, 1980, suffered from a chronic form of schizophrenia, which caused him to lack substantial capacity to conform his behavior to the requirements of law, but that he "did have the capacity to understand the wrongfulness of his act." Two of these doctors expressed the view that Riva suffered from paranoid schizophrenia on the date of the killing. One doctor thought Riva was a "manic depressive," whose "conduct was influenced by delusions and possibly hallucinations." No one of these four psychiatrists who testified first saw Riva until about eight months after the killing of his grandmother, when Riva had been for some time under medications "used in an attempt to tone down . . . the visible effects of . . . psychosis." One such witness referred to hospital records from Bridgewater showing treatment of Riva there shortly after the killing, when medication, based on a diagnosis of schizophrenia, was prescribed to prevent assault.

[9] These materials included police reports, the probable cause transcript, reports of talks with witnesses, autopsy report, and some hospital records (Bridgewater State Hospital, some data from Taunton State Hospital, and Mayflower Counselling Service). Other hospital reports (McLean Hospital, Boston University Hospital, and Taunton State Hospital) he examined after he had written his report. Before he testified, he had seen reports of two of the four psychiatrists called as witnesses by Riva and several reports of doctors who did not testify contained in hospital records. Dr. Kelly testified that, in the reports of other doctors, he was interested in clinical data mentioned by them, but that he felt he had to come to his own conclusions and diagnosis based on the available data.

to some of Riva's hospital confinements and to the killing of his grandmother on April 10, 1980. He examined Riva on October 10, 1981. In Dr. Kelly's opinion, (1) a tape recording of the police conference with Riva on the afternoon of April 11, 1980 (see note 1, *supra*), was of special importance in establishing Riva's mental state at that time,[10] and (2) Riva was criminally responsible on the previous day when the grandmother was killed. See the *McHoul* case, 352 Mass. at 546 n.7, *supra*.[11]

Upon all the conflicting evidence outlined above, it was open to the jury, as fact finders, to conclude that the Commonwealth had established beyond a reasonable doubt that Riva had criminal capacity when he killed his grandmother. The Commonwealth, as in *Commonwealth v. Amaral*, 389 Mass. 184, 191-193 (1983), did not rely merely on the presumption of sanity or upon circumstantial evidence of Riva's sanity. Instead, it introduced Dr. Kelly's medical testimony. See *Commonwealth v. Kostka*, 370 Mass. at 540 (Hennessey, C.J., dissenting in part). Compare *Commonwealth v. Guiliana*, 390 Mass. 464, 469-471 (1983), where the Supreme Judicial Court, acting under G. L. c. 278, § 33E, remanded that case for a

---

[10] That tape, Dr. Kelly testified, showed that Riva "was able to respond cogently to the questions . . . put to him. He understood the questions. He made . . . responses . . . denying his involvement and even . . . [discussing] possibilities as to what might have happened. . . . [H]e was not confused, he was able to organize his thoughts . . . . [His] was not the behavior of someone . . . in a state that would interfere with the requisite [*McHoul* case] capacities." Riva's discussion with Dr. Kelly indicated to the latter that Riva "could manage his behavior and operate in a way that would be consistent with his self interest," as did Riva's denial of involvement in the killing until his talks with his mother at the house of correction in June, 1980.

[11] Dr. Kelly was of opinion that Riva's history and behavior was not consistent with a diagnosis of paranoid schizophrenia, although he thought Riva has a mental illness which does not remove criminal capacity in the *McHoul* sense. Dr. Kelly's view was that "Riva has . . . a borderline personality disorder" and is a person "not capable of really mature relationships with other people" and is likely to "develop a large fantasy system around" him. Usually such persons, the witness said, "have a history of being in trouble either with the law or with school authorities."

new trial.[12] Compare also *Commonwealth* v. *Gould,* 380 Mass. 672, 679-680 (1980), where § 33E relief was granted; *Commonwealth* v. *Louraine,* 390 Mass. 28, 34-36 (1983).

The Appeals Court does not possess the powers which are given to the Supreme Judicial Court alone in capital cases by G. L. c. 278, § 33E, as appearing in St. 1979, c. 346, § 2. See *Commonwealth* v. *Carballo,* 9 Mass. App. Ct. 57, 61 (1980); *Commonwealth* v. *Cullen, ante* 644, 647 (1984). See also *Commonwealth* v. *Davis,* 380 Mass. 1, 12-17 (1980). This court on appeal may not set aside a verdict of guilty on the ground that it is against the weight of the evidence, where the trial judge (who heard and saw the witnesses) has denied (as this judge did) a motion for a new trial. We perceive no abuse of discretion by him.

2. Riva's counsel contends that the judge gave an inadequate charge under *Commonwealth* v. *Mutina,* 366 Mass. 810, 823 n.12 (1975), where it was said, "[*I*]*n all trials and retrials after this date* [February 11, 1975] where the defense of insanity is fairly raised, the defendant, *on his timely request,* is entitled to an instruction regarding the consequences of a verdict of not guilty by reason of insanity. Such an instruction shall also be given on the request of the jury, if the defendant does not object thereto. We emphasize that our holding is not to be extended beyond advising the jury of the consequences of that verdict. We do not depart from the long-standing general rule that neither sentencing nor parole may appropriately be considered by the jury in reaching their verdict." (Emphasis supplied.) On October 27, 1981, Riva's trial counsel filed with the judge requests for rulings. The judge discussed with both the prosecutor and defense counsel one request relating to the *Mutina* case.

The portion of the charge discussing consequences of a verdict of not guilty by reason of insanity in general follows the

---

[12] The judge properly denied a required finding that Riva was not guilty by reason of insanity. The judge and the jury were not bound to give conclusive effect to the opinions of the experts who testified in behalf of Riva. See *Commonwealth* v. *Lunde,* 390 Mass. 42, 47 (1983).

request, and is set out in the margin.[13] At the close of the main part of the charge, defense trial counsel sought no further instruction on the *Mutina* principle but, instead, said, "You did . . . cover the requests I gave." The judge then explained the verdict slips and defense counsel made no further relevant comment.[14]

The charge in the present case was delivered on October 28, 1981, over a year before the publication of the opinion of this court in *Commonwealth* v. *Loring,* 14 Mass. App. Ct. 655, 657-661 (1982), imposing detailed standards for a judge's instructions in *Mutina*-type cases. The present trial judge was not required to anticipate the *Loring* decision, particularly where defense counsel after the charge told him that he had given the requested instruction. See *Commonwealth* v. *Correia, ante* 178, 182-184 (1984).[15]

---

[13] This part of the charge read, "I . . . instruct you that in the event that the defendant is found not guilty by reason of insanity, that the provisions of General Laws Chapter 123, Section 16, come into play . . . . The Court having jurisdiction over the criminal proceedings — and, of course, that refers to this Court — may order that a person who is found not guilty by reason of mental illness or mental defect be hospitalized, et cetera, et cetera. This commitment can be to the Bridgewater State Hospital for care and treatment. Later, if the Court finds that the defendant is mentally ill, and that his discharge would create a likelihood . . . to harm himself or others, then the defendant would be committed to a facility and upon certain statutory terms. In that area, I go no further."

[14] It should be noted that in *Commonwealth* v. *Callahan,* 380 Mass. 821, 827-828 (1980), it was said, "The *Mutina* case does not prescribe any particular wording to be used in instructing a jury . . . but requires that in certain circumstances an instruction be given which fairly informs the jury of the possible consequences of a verdict of not guilty by reason of insanity. These consequences are governed by the procedures set forth in G. L. c. 123, § 16, which permits an initial observation period, a motion for commitment by the district attorney, a possible initial period of commitment, and upon re-evaluation, possible additional periods of commitment . . . . It is not necessary that a judge refer in his charge to the specific time periods set forth in the statute. He cannot, of course, predict the outcome or the ultimate length of commitment in a particular case, since this will depend on the evidence presented at the time of periodic re-evaluations of a committed person."

[15] We perceive no respect in which the failure to give additional instructions, never requested, could result in a substantial risk of a miscarriage of justice. Particularly is this true, when one recognizes that the *Mutina* prin-

3. In behalf of Riva it is contended that Riva's mother acted as an agent of the police in interviewing Riva at the house of correction about June 10 and 12, 1980. The trial judge, after hearing a pretrial motion to suppress these statements, found (saving Riva's rights), "that there has not been [established] any agency within the meaning of the law" and "that Mrs. Jones did not function as an instrument of any police or government authority." He also found "that there was no scheme of any sort."[16]

Riva's mother, who thus had been found not to be acting under police instructions, was not shown to have been a paid informant as in *United States* v. *Henry,* 447 U.S. 264 (1980). See also *Commonwealth* v. *Mahnke,* 368 Mass. 662, 676 et seq. (1975). The trial judge's findings (that Riva's mother was not an agent of the police) were warranted.

The judge held a special voir dire on the question whether Riva's statements to his mother were voluntary. He charged appropriately on that issue. *Commonwealth* v. *Day,* 387 Mass. 915, 923 (1983).

*Judgments affirmed.*

*Order denying motion for a new
trial affirmed.*

ciple is an exception to the usual rule that a jury should "not, in arriving at their verdict, consider either sentencing or parole possibilities." See the *Loring* case, 14 Mass. App. Ct. at 655. We decline the prosecution's invitation to consider whether the *Loring* case imposes too rigid a standard for use in comparable cases.

[16] These findings were amply supported by Riva's mother's own pretrial testimony that she had undertaken to assist the police in providing background about the psychological problems Riva had encountered during his earlier years, and that she had gone to see Riva while at Bridgewater, and later at the house of correction, "because he was her son." She indicated that she was concerned about Riva's sick and disturbed appearance when she saw him at the house of correction. She reported her conversations to the Marshfield police because she wanted to "get Jimmy [Riva] back into Bridgewater," where he would get medication, apparently not then being given to him. She denied that she had gone to see her son at the request or suggestion of the Marshfield police. This testimony was generally consistent with that of two police officers who had conferred with Riva's mother.