# United States Court of Appeals
## For the First Circuit

No. 14-1894

JAMES P. RIVA, II,

Petitioner-Appellant,

v.

EDWARD FICCO,

Respondent-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Thompson, Kayatta, and Barron,
Circuit Judges.

Rachel T. Rose, with whom Elizabeth Billowitz was on brief, for appellant.
Annette C. Benedetto, Assistant Attorney General, with whom Maura Healey, Attorney General, was on brief, for appellee.

September 29, 2015

**BARRON**, **Circuit Judge**.  James Riva II has filed a habeas petition in federal court that challenges his three-decades-old state murder conviction.  The principal issue on appeal is whether the District Court erred in ruling that Riva had filed that petition too late, given the one-year limitations period that the Anti-Terrorism and Effective Death Penalty Act (AEDPA) establishes for filing federal habeas petitions that challenge state convictions.  We conclude that the District Court did not err, and so we affirm the petition's denial.

## I.

Riva's crime is an especially horrifying one.  At about 3:00 p.m. on April 10, 1980, Riva drove to his grandmother's house in Marshfield, Massachusetts and found her lying on a couch.[1]  She asked him to do some washing for her, and he did.  He then retrieved from the cellar a gun and gold-painted bullets, which he had hidden in a gray-metal box.  When Riva's grandmother saw the gun, she threw a glass at him.  Riva shot her at least twice, stabbed her, carried her into her bedroom, poured dry gas over her, and set her on fire.  Riva then left the house and drove to a nearby town to pick up his father.

---

[1] We take the facts from the decision of the Massachusetts Appeals Court affirming Riva's conviction on direct review, see Commonwealth v. Riva, 469 N.E.2d 1307 (Mass. App. Ct. 1984) ("Riva I"), and from our prior opinion in this case, see Riva v. Ficco, 615 F.3d 35 (1st Cir. 2010) ("Riva III").

The police later recovered Riva's gray-metal box from Riva's grandmother's house. Riva made repeated efforts to retrieve the box from the police. At one point, Riva even struck a police officer while trying to recover the box. Police then arrested Riva and charged him with murder, arson, and assault and battery of a police officer.

At trial, Riva argued that he was not guilty by reason of insanity. His mother testified at trial in support of that defense. She testified that when she visited Riva two months after the murder, he told her that "his brain was on fire, that he was sick, his stomach hurt," "that he had to talk to somebody," and "that the voices were really bad in his head." See Commonwealth v. Riva, 469 N.E.2d 1307, 1308 (Mass. App. Ct. 1984) ("Riva I"). The Massachusetts Appeals Court described other aspects of the mother's testimony about what Riva had said about why he had committed the crime as follows:

> [Riva] told her also that he had meditated suicide but the voice dissuaded him. Riva explained that the bullets "had to be painted gold because, if they weren't gold, they wouldn't find their mark." He went on to say, "I didn't stab her and didn't hit her on the head like they said I did, but I then drank her blood because, you know, I have to because that's what vampires do," and then, after an interval, "I didn't want it to happen, and I kept telling the voice all day that I couldn't do it."

Id. at 1309 n.4.

In further support of Riva's insanity defense, the mother also testified about distressing behavior that Riva had

- 3 -

exhibited over the course of his life.  The Massachusetts Appeals

Court described this portion of the mother's testimony as follows:

> At four, he had an altercation with his father and tried
> to call the police and, when that was prevented,
> attempted to injure his father.  When hospitalized with
> pneumonia and later in kindergarten, he drew pictures of
> bleeding human anatomies and of people being shot.  At
> thirteen he started drawing pictures of vampires and of
> women with puncture wounds dripping blood.  He
> periodically began eating food with the appearance of
> blood (mixtures of oil, ketchup, parts of animals).  He
> would go long periods without sleep and would run away.
> His school attendance suffered and he became involved
> with the police.  In 1974 he was committed to McLean
> Hospital (a psychiatric hospital) for six months.  After
> release, he continued out-patient treatment and also his
> earlier strange conduct.  He was committed to a Westwood
> hospital because of threats to kill his father.  He
> engaged in strange conversations with his mother and
> referred to "voices from outer space . . . [that] would
> be directing his body."  He left an apartment to which
> he had moved, and disappeared for four months. He turned
> up in Florida.  After his return, he killed a cat, cut
> off its head, and took out its brain, in an effort to
> learn how to "fix his own" brain.  He told his mother
> that he had drunk the cat's blood.

Id. at 1309 n.5.

To rebut the insanity defense, the Commonwealth put on

a psychiatrist who testified that, at the time of the killing,

Riva was capable of conforming his behavior to the law.  The

Commonwealth's expert based that conclusion on his assessment of

Riva's conduct on the day of the murder and on his review of the

taped interview that the police conducted with Riva soon after the

murder.

- 4 -

The trial lasted seven days. The jury rejected Riva's insanity defense and convicted him of second-degree murder, arson, and assault and battery of a police officer. Riva received a sentence of life in prison.

Soon after sentencing, the Commonwealth committed Riva to Bridgewater State Hospital, a psychiatric institution for inmates. Riva remained there until January 1989, when he was returned to the general prison population. In September 1990, however, Riva assaulted a prison officer while Riva was under the paranoid delusion that the officer had been draining fluid from Riva's spine. Riva was charged with assault, found not guilty by reason of insanity, and sent back to Bridgewater. But in August 1999, Riva again returned to the general prison population.

While institutionalized at Bridgewater, Riva made numerous unsuccessful attempts to obtain relief from his conviction. He filed four motions for a new trial in state court, two with the aid of counsel, and two on his own or, to use the legal term, pro se. Riva filed those motions in 1982, 1987, 1995, and 1999. Riva also filed two motions in state court to revise or revoke his sentence. He filed the first with the aid of counsel in 1982, and the second pro se in 1993. Finally, Riva filed three federal habeas petitions, in 1987, 1996, and 1998, only the last of which he filed with the assistance of counsel.

Then, in 2001, Riva filed the federal habeas petition that is now before us.  The AEDPA establishes a one-year limitations period for such filings.  Ordinarily, the limitations period begins to run when a petitioner's conviction becomes final.  But Riva's conviction became final in 1985.  That was more than twenty years before Congress had even passed the AEDPA.  Thus, in Riva's case, the one-year limitations period began running on April 24, 1996, as that was the day that the AEDPA became effective.  See Delaney v. Matesanz, 264 F.3d 7, 10-11 (1st Cir. 2001) (explaining that courts have interpreted the AEDPA to allow a one-year grace period within which state prisoners may file federal habeas petitions to challenge convictions that became final before the AEDPA's effective date).

Even though Riva filed his habeas petition four years after the AEDPA limitations period expired on April 24, 1997, he argued to the District Court that his mental illness excused his seemingly late filing.  He contended that his illness should have equitably tolled the running of the limitations period.  He also argued, alternatively, that he had new evidence to show that his illness rendered him actually innocent of the crime (by validating his insanity defense) and thus that the limitations period did not even apply to him.

The District Court rejected Riva's request for equitable tolling and dismissed the petition as untimely, without addressing

- 6 -

Riva's actual innocence claim.  Riva v. Ficco, No. 01-12061-MLW, 2007 WL 954771 (D. Mass. Mar. 28, 2007) ("Riva II").  We vacated and remanded.  Riva v. Ficco, 615 F.3d 35 (1st Cir. 2010) ("Riva III").

We held, as a matter of first impression, that mental illness can constitute a ground for equitably tolling the AEDPA's limitations period.  Id. at 40.  We also held that the District Court made various errors in evaluating whether Riva's mental illness warranted equitably tolling the limitations period.  Id. at 42-44.  We therefore instructed the District Court to develop the record and reconsider Riva's equitable tolling argument.  Id. at 44.  We also instructed the District Court to consider, for the first time, Riva's separate argument that his new evidence of actual innocence (due to his insanity) rendered the limitations period inapplicable.  Id. at 44 n.4.

On remand, the District Court developed the record, considered both of Riva's arguments, and again dismissed Riva's habeas petition as untimely.  Riva v. Ficco, No. 01-12061-MLW, 2014 WL 4165364 (D. Mass. Aug. 21, 2014) ("Riva IV").  Riva now appeals.

## II.

We held in Riva III that Riva bears the burden of establishing that his mental illness entitles him to equitable tolling of the AEDPA's limitations period, and that, to satisfy

that burden, Riva must demonstrate that there is "some causal link" between his mental illness and "his ability seasonably to file for habeas relief." 615 F.3d at 39-40. We said that Riva could establish such a link if he could show that, "during the relevant time frame, he suffered from a mental illness or impairment that so severely impaired his ability either effectively to pursue legal relief on his own behalf or, if represented, effectively to assist and communicate with counsel." Id. at 40. And we identified the relevant time frame as spanning most of the approximately three years between April 24, 1996 and March 17, 1999. Id. at 41.[2]

There is no doubt that Riva suffers from a serious mental illness, and the government does not contend otherwise. At the same time, Riva's mental illness has not stopped Riva from making numerous legal filings -- including some quite cogent and sophisticated ones that he made even without the aid of counsel. The key question is whether Riva has shown that his tardiness in filing his habeas petition may be attributed to his mental illness rather than to the lack of diligence that even late-filing petitioners who have no such illness have been known to exhibit.

---

[2] We set that as the time frame because we concluded that Riva's fourth motion for a new trial in state court successfully tolled most of the period between March 17, 1999 and his 2001 filing of the habeas petition that is now before us. Riva III, 615 F.3d at 41.

- 8 -

As we said the last time that we took up this issue, "[t]his is a complex case, in which various pieces of evidence point in different directions," and "[i]t is a close call as to whether or not equitable tolling is warranted." Id. at 44. But as we also made clear at that time, the call is the District Court's to make so long as the District Court does not abuse its discretion in making it. Id. at 40.

Here, the District Court determined that Riva had not shown that his mental illness explained the lateness of his filing. And the District Court supplied a careful and well-reasoned explanation for that conclusion, in which the District Court specifically and satisfactorily addressed the concerns that we raised in Riva III. We thus see no basis for overturning the District Court's decision.[3]

We start with the District Court's findings about an issue that caused us significant concern in Riva III. There, we concluded that the District Court had given too much weight the first time around to evidence that showed Riva was capable of making legally coherent legal filings and not enough weight to evidence that could shed light on "the petitioner's ability to

---

[3] Contrary to Riva's contention, the merit of his underlying claims for habeas relief cannot excuse an otherwise unjustified failure to act within the limitations period. See Trapp v. Spencer, 479 F.3d 53, 61 & n.8 (1st Cir. 2007). And so we decline his invitation to evaluate those claims.

sustain the lucidity necessary to effectively pursue legal redress once filings were effectuated." Id. at 43. We found the latter consideration important in light of Riva's expert's sworn statement that Riva's mental illness had "'interfered with [Riva's] ability to sustain the attention and effort necessary for him to consistently'" pursue legal relief. Id. (emphasis added). By focusing only on individual filings, therefore, the District Court had potentially overlooked crucial evidence that Riva's mental illness affected his ability to pursue his legal claims.

But this time around the District Court did address this issue head on. And, in doing so, the District Court reasonably found that Riva had not shown that his mental illness prevented him from following through in litigation in a sustained way.

The District Court noted that Riva's 1996 federal habeas petition, which Riva filed pro se just before the one-year limitations period began to run, was "detailed" and "informative." Riva IV, 2014 WL 4165364, at *7, 13-14. But the District Court then went on to observe that Riva was attentive to his 1996 petition even after he filed it. Id.

For example, the District Court noted that when the Commonwealth failed to respond to the 1996 petition, Riva moved for default judgment. And the District Court further noted that when the petition was erroneously dismissed for insufficient service of process, Riva successfully advocated to reinstate it.

- 10 -

Finally, the District Court observed that Riva voluntarily dismissed his petition when he realized that he had failed to exhaust his federal claims in state court. Id. at *13-14.

Riva contends that the District Court failed to consider that, after Riva voluntarily dismissed the 1996 federal petition, he did not then return to state court to exhaust the federal claims that were contained in that petition. But Riva's misstep in that one regard does not demonstrate that he was unable to follow up on his filings due to his mental illness. That misstep reveals only that Riva had followed up but in the wrong way -- something that diligent petitioners without mental illnesses do all too often, especially when, like Riva, they are not assisted by counsel.

Moreover, Riva did return to state court around the same time that he voluntarily dismissed his 1996 federal habeas petition. Riva wrote Judge Peter Brady of the Massachusetts Superior Court in September 1996 and requested that the judge rule on his second motion to revise and revoke his sentence, which Riva had filed in 1993. That approach, too, was not the legally correct one. And that should hardly be a surprise, given the complexity of the rules for filing habeas petitions and Riva's pro se status. But while Riva's follow-up was substantively mistaken, it was a follow-up just the same. And a timely one at that. Thus, the fact that Riva made this effort -- flawed though it was -- supports the District Court's finding about Riva's capacity to follow

through on his claims in a sustained manner during the relevant time period.

In response, Riva contends that the District Court failed to consider the various times that Riva successfully filed legal documents but then failed to follow up on them. But the District Court did not overlook the incidents that Riva identifies. See id. at *5-6. The District Court determined instead that the many times that Riva did follow up supported the conclusion that a failure to follow up "was not typical of his pattern of litigation." Id. at *15. And the record does not show that this finding was clearly wrong.

In addition to finding that Riva had not made the case that his illness prevented him from following up on his filings during the relevant time period, the District Court also found that Riva had not proven that his illness prevented him from cooperating with counsel during that time period. The District Court pointed in particular to what the record revealed about Riva's communications with counsel in 1995 (which was just before the start of the relevant time frame for evaluating his equitable tolling claim) and again in 1998 (which was during that time frame).

At least twice in 1995, the District Court noted, Riva wrote letters to Richard Passalacqua, who represented Riva on his third motion for a new trial. And the District Court supportably

found that the letters revealed Riva's deep engagement in the litigation and that his "understanding of some of the demands of his litigation efforts was at least as sound as that of his professional counsel." Id.[4]

The District Court also pointed to evidence in the record about Riva's relationship with Barbara Smith, the attorney who helped Riva file his 1998 habeas petition -- a filing that occurred during the relevant time frame. Id. at *14. The District Court found that the record supported the conclusion that Riva did cooperate with Smith. And while Riva sharply disputes that finding, it rests on a supportable inference, although not one that is compelled.[5]

---

[4] Riva explained to Passalacqua in one letter that "[t]here are eight Com v. Moores in the Massachusetts Digest. The judge probably knows which one we are talking about, but I really think you should put in the numerical cites." In another letter, Riva writes: "I am in receipt today of the Commonwealth's brief that you sent. Now we had many discussions about the Commonwealth's opening argument and I wrote you many letters concerning the an [sic] issue not raised is deemed waived unless you use the issue of ineffective assistance of counsel. You assured me that it is only an issue of the appeals court. I want you to immediately file a rebuttal brief stating your authorities for this claim. You might not think this appeal is winnable in front of Brady, but I do. . . . You will have to put me on the stand to counter the DA's claim I was given a Lamb warning."

[5] Riva alleges that he wrote a letter to the court clerk in July 1998 inquiring whether Smith had filed a habeas petition on his behalf, and that that letter indicates that Riva was not communicating with Smith. But the record includes only the clerk's response, which states: "The Court is in receipt of your letter date [sic] July 30, 1998. Please be advised that to date, we have received no Habeas Petition on your behalf by Attorney Barbara A.H. Smith." The District Court did not abuse its discretion in

- 13 -

Considering the evidence of cooperation as a whole, we cannot say that the District Court erred in finding that Riva failed to demonstrate that his mental illness prevented him from cooperating with counsel. Riva points to no reliable evidence to show that he did not cooperate with Smith, let alone that his illness rendered him incapable of doing so. And the evidence plainly shows that Riva was fully able to cooperate with his counsel in 1995, just before the limitations period began to run.

Finally, the District Court did not err in giving weight to Riva's "organized and comprehensible" pursuit of collateral proceedings in state court in the 1980s and early 1990s, as well as to Riva's attention to a civil rights case that he had filed on his own in 1987 and that he had litigated all the way to the Supreme Court. Id. at *14-15. The District Court reasoned that "effective litigation by Riva prior to 1996 tends to indicate that Riva had a similar capacity to pursue his legal affairs during the tolling period," id. at *13, and we see no error in that reasoning.

Riva contends that the District Court should not have considered evidence from before the relevant time frame. He argues that the District Court's logic in considering that evidence rests on the unsupported premise that Riva's mental state had improved

---

refusing to infer the content of Riva's letter to the clerk from the clerk's vague response.

by the beginning of that time frame, in 1996. But the District Court's determination that Riva had a similar capacity to pursue legal relief prior to 1996 as he did after 1996 does not depend on such a premise. The District Court's determination depends only on the finding that Riva's condition had not worsened. But Riva does not argue that it had. And, in fact, the record contains evidence that his condition had improved.[6] Thus, the District Court did not abuse its discretion in drawing upon evidence of Riva's past capacity to litigate effectively a claim in determining that Riva had a similar capacity during the time period relevant to equitable tolling.

The District Court had a difficult task, but it "plainly consider[ed] all the pertinent factors and no impertinent ones" and provided a "thorough explanation" of its reasoning. Riva III, 615 F.3d at 44 (internal quotation marks omitted). We thus hold that its "refusal to apply principles of equitable tolling to salvage [Riva's] time-barred habeas application does not constitute an abuse of discretion." Id. (internal quotation marks omitted).

---

[6] Both parties' experts acknowledge that Riva's condition had improved, and Riva himself, in various legal filings and letters in 1995 and 1996, as well as in an affidavit to the District Court in the instant action, indicated that his condition was sufficiently controlled during the relevant time frame to permit him to pursue his legal claims.

We next turn to Riva's other argument for excusing the lateness of his filing.  Under the AEDPA, a "credible showing of actual innocence" provides a "gateway" through which a petitioner may pursue his claims on the merits notwithstanding his failure to file his habeas petition within the statute's otherwise applicable limitations period.  McQuiggin v. Perkins, 133 S.Ct. 1924, 1931 (2013).  To pass through this gateway, however, a petitioner must satisfy the standard for actual innocence articulated by the Supreme Court in Schlup v. Delo, 513 U.S. 298 (1995).

Specifically, Schlup requires a petitioner to show that, in light of newly presented evidence, "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt," id. at 327, or, to remove the double negative, "that more likely than not any reasonable juror would have reasonable doubt," House v. Bell, 547 U.S. 518, 538 (2006).  And further, Schlup makes clear that, "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial."  513 U.S. at 324.

Riva premises his case for making it through the gateway on newly presented evidence that Riva contends shows that he was

legally insane at the time of the murder. Neither we nor the Supreme Court has decided whether an insanity defense, if proven, amounts to proof of actual innocence and thus a basis for passing through the gateway the AEDPA leaves open to late filers. See Rozzelle v. Secretary, Fl. Dep't of Corrections, 672 F.3d 1000, 1013-15 (11th Cir. 2012) (citing cases in other circuits going both ways). But we need not decide the issue here, because the District Court supportably found that Riva's new evidence did not meet the Schlup standard even assuming proof of legal insanity could constitute proof of actual innocence. Riva IV, 2014 WL 4165364, at *21-24; see Awon v. United States, 308 F.3d 133, 140 (1st Cir. 2002) ("On an appeal from the denial of a [petition for habeas corpus], we review the district court's legal determinations de novo and the court's factual findings for clear error.").

Riva's newly presented evidence consists of opinions from a psychiatric expert that Riva recently retained. But that expert opinion evidence is only indirectly probative of Riva's mental state on the day of the murder.[7] Given the competing trial evidence about Riva's state of mind at that time,[8] we cannot say

---

[7] The expert contends that an IQ test Riva took two years before he killed his grandmother supports his insanity defense and that, at trial, the Commonwealth's psychiatric expert misrepresented the nature of Riva's mental illness.

[8] That evidence included: the testimony of Riva's great-uncle concerning Riva's normal behavior in the week preceding the

- 17 -

Riva has met the Schlup standard.  Schlup, 513 U.S. at 328 (instructing courts to consider a claim of actual innocence "in light of all the evidence").  We thus affirm the District Court's ruling on this point, too.[9]

## IV.

For the foregoing reasons, the decision of the District Court is **affirmed**.

offense; the testimony of Riva's high school teacher about an unremarkable conversation with Riva hours before he killed his grandmother; a recording of a police interview the day after the incident in which Riva understood and responded to questions, denied involvement, and suggested alternative causes for the fire; and the premeditated, organized fashion in which Riva carried out and attempted to conceal his act, including his use of dry gas to burn the body and his attempt to retrieve his box of bullets and papers from the police the day after the crime.

[9] We also affirm the District Court's denial of Riva's request, under the Criminal Justice Act, for funding for further neurological testing.  Given the substantial evidence at trial of Riva's legal sanity when he killed his grandmother, there is not "clear and convincing evidence" that Riva was prejudiced by the court's denial of funding for neurological testing that Riva's medical expert says "could" detect that Riva has "an observable brain abnormality associated with schizophrenia."  See United States v. Canessa, 644 F.2d 61, 64 (1st Cir. 1981) (stating that a district court's refusal to authorize funding under the Criminal Justice Act is not reversible error unless there is "clear and convincing evidence showing prejudice").